IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY ANN KENNEDY, | ) | CASE NO.  1:25-CV-01814-SL |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Kimberly Kennedy ("Plaintiff" or "Kennedy"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In February 2023, Kennedy filed an application for SSI, alleging a disability onset date of January 1, 2020, and claiming she was disabled due to alcohol use disorder, adjustment disorder with mixed anxiety and depressed mood, generalized anxiety disorder, possible Huntington's disease, and PTSD.  (Transcript

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

("Tr.") 18, 65.)  The application was denied initially and upon reconsideration, and Kennedy requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 18.)

On July 22, 2024, an ALJ held a hearing, during which Kennedy, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On August 12, 2024, the ALJ issued a written decision finding Kennedy was not disabled.  (*Id.* at 18-29.)  The ALJ's decision became final on July 8, 2025, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On August 29, 2025, Kennedy filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9-11.)  Kennedy asserts the following assignments of error:

(1)     The ALJ's RFC determination is the product of legal error because the ALJ failed to properly evaluate Plaintiff's subjective complaints pursuant to SSR 16-3p and 20 C.F.R. § 416.929, leaving the Court unable to proceed to a substantial evidence review.

(2)     The ALJ's RFC determination is unsupported by substantial evidence and is the product of legal error where the ALJ failed to properly evaluate Plaintiff's treating provider Dr. Kostyk's opinions in compliance with Social Security regulations.

(Doc. No. 9.)

## II.    EVIDENCE

## A.    Personal and Vocational Evidence

Kennedy was born in December 1990 and was 33 years old at the time of her administrative hearing (Tr. 18, 28), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c). She has a limited education.  (Tr. 28.)  She has no past relevant work.  (*Id*. at 27.)

**B.      Relevant Medical Evidence[2]**

On April 18, 2023, Ashlie Pehtel, MSW, LSW, wrote a letter stating that Kennedy underwent a mental health assessment on May 28, 2021.  (*Id.* at 299.)  At that time, treatment providers recommended Kennedy complete treatment three hours per day, three days per week, for 16 weeks, in addition to individual one-hour sessions at least once per week.  (*Id.*)  Pehtel stated that Kennedy completed the program on June 29, 2022, and opined that Kennedy had responded well to substance abuse treatment.  (*Id.*)  However, Pehtel commented that Kennedy's "mental health symptoms may serve as a barrier for full-time employment." (*Id.*)  Pehtel opined that Kennedy was "likely to struggle" with "maintaining concentration and pace" and "responding appropriately to supervision, coworkers, and work pressures."  (*Id.*)  Pehtel further opined that Kennedy's "mental health progression is likely to regress if she is exposed to a full-time job."  (*Id.*)

On July 22, 2023, Kennedy saw Cameron Gachett, D.O., for a physical consultative examination. (*Id.* at 301, 304.)  Dr. Gachett noted Kennedy alleged disability based on mental illness.  (*Id.*)  Kennedy reported her typical daily activities consisted of going to the gym, practicing yoga, meditating, and watching television.  (*Id.* at 301.)  Kennedy endorsed symptoms of headaches, lightheadedness, difficulty with memory, poor muscular coordination, emotional problems, and difficulty handling and manipulating objects due to dropping things.  (*Id.* at 302.)  On examination, Dr. Gachett found a "symmetric, steady gait," good hand-eye coordination, negative Romberg test, no palpable muscle spasm, normal muscle tone, normal strength, normal range of motion, intact sensation, negative straight leg test, and abnormal tandem walking. (*Id.* at 303.)  Dr. Gachett noted that Kennedy could squat and rise from the position with ease, rise from a sitting position without assistance, and get on and off the exam table without difficulty.  (*Id.*)  Dr. Gachett

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

further noted Kennedy walked on heals and toes with ease and could hop on one foot bilaterally.  (*Id.*)  Dr. Gachett described the physical examination as "unremarkable."  (*Id.*)

On September 19, 2023, Kennedy saw Sudhir Dubey, Psy.D., for a psychological consultative examination.  (*Id.* at 311, 318.)  Kennedy endorsed motor problems, memory problems, comprehension and concentration problems, and a history of depression, anxiety, and PTSD.  (*Id.* at 311.)  She reported having regular contact with friends and family.  (*Id.* at 312.)  Kennedy described her mood as depressed, irritable, and stressed, and endorsed occasional crying, sleep difficulties, and decreased energy levels.  (*Id.*)  Kennedy also reported anxiety that was sometimes triggered by larger crowds; associated symptoms included increased heart rate and dizziness.  (*Id.*)  Kennedy saw a psychiatrist monthly and a counselor twice a week, which she found helpful.  (*Id.*)  Kennedy reported leaving school in the tenth grade because of problems focusing, and she was not working because of her depression and physical impairments.  (*Id.* at 313.)  She told Dr. Dubey that she "was always able to meet the basic job expectations and requirements" at her previous jobs.  (*Id.*)  Her activities included listening to music, watching TV, using her phone, and going to the gym.  (*Id.*)  Kennedy reported needing help managing money and maintaining a schedule because of her cognitive and memory issues.  (*Id.*)

On examination, Dr. Dubey found appropriate eye contact, calm and stable behavior, normal speech, and estimated cognitive functioning in the low average range.  (*Id.* at 314.)  Dr. Dubey noted Kennedy's math skills were poor, and Kennedy could only do simple subtraction.  (*Id.*)  She recalled 0 out of three items after a five-minute delay.  (*Id.*)  She refused to attempt serial 7s.  (*Id.*)  Dr. Dubey opined that Kennedy would be able to understand, remember, and carry out simple instructions, such as one-step processes, as well as multi-step instructions, independently.  (*Id.* at 316.)  Kennedy could maintain concentration, attention, and pace to remember and carry out simple tasks independently.  (*Id.* at 317.)  She would be unable to maintain concentration, attention, and pace to carry out multi-step tasks independently because of

4

memory issues, although she could do so with supervision.  (*Id.*)  Dr. Dubey opined that Kennedy "would have some issues" interacting with supervisors and coworkers because of her reported mood issues, which "may lead to some frustration for her, coworkers, and supervisors."  (*Id.*)  Dr. Dubey further opined that Kennedy "would have some issues" dealing with work pressure because of memory and mood issues.  (*Id.* at 318.)

On October 18, 2023, Sandra K. Kostyk, M.D., Ph.D., wrote a letter at Kennedy's request setting forth an opinion regarding the impact of Kennedy's Huntington's disease and her neurological issues on her ability to obtain and maintain employment.  (*Id.* at 320, 322.)  Dr. Kostyk opined that Kennedy was disabled as a result of her Huntington's disease and was unable to work.  (*Id.* at 320.)  Dr. Kostyk further opined that Kennedy's "abnormal movements and behavioral and cognitive problems are likely to make it difficult for her to find employment and will likely make it difficult for her to keep a job long term."  (*Id.*)  Dr. Kostyk reported that Kenndy had "notable dystonia that interferes with her motor skills."  (*Id.* at 321.)  In addition, because of her impaired balance and coordination, Kennedy should avoid climbing, lifting, and walking while carrying any objects that might worsen her balance.  (*Id.*)  Dr. Kostyk further reported that Kennedy had problems with depression, suicidal ideation, and substance abuse, as well as problems with focus and concentration.  (*Id.*)  Dr. Kostyk opined that Kennedy "has trouble tolerating even mildly stressful situations."  (*Id.*)  Dr. Kostyk reported that Kennedy was currently showing difficulty with executive function and planning ability, which was "commonly associated with HD."  (*Id.*)

On January 29, 2024, Kennedy saw Anne Kloos for a physical therapy evaluation and reported that she exercised three times a week by doing kickboxing and strength training at the gym and yoga at home.  (*Id.* at 459.)  She denied falls in the past six months, although she had caught her toes on the stairs twice in the past six months but caught herself and did not fall.  (*Id.*)  On examination, Kloos found normal strength, normal range of motion, and an unassisted gait.  (*Id.*)

That same day, Kennedy saw Dr. Kostyk for follow up and reported doing "'[n]ot too bad'" since her last visit.  (*Id.* at 460.)  She felt that she was doing about the same.  (*Id.*)  Sleep continued to be a problem, and she had not started mirtazapine since it had not helped in the past.  (*Id.*)  Kennedy told Dr. Kostyk her movements were about the same and denied any falls in the past week and the last six months.  (*Id.*)  Kennedy continued to practice yoga and do kickboxing for exercise.  (*Id.*)  On examination, Dr. Kostyk found decreased attention span and limited fund of knowledge.  (*Id.* at 462.)  Kennedy could not complete serial 7s or make simple calculations.  (*Id.*)  Kennedy followed three step commands, had immediate recall of four out of four objects, and could recall three out of four objects after distraction.  (*Id.*)  However, Kennedy recalled one object when given a list of choices in a category.  (*Id.*)  Dr. Kostyk further found no drift and no atrophy, full strength, and intact sensation.  (*Id.* at 463.)  Dr. Kostyk noted that Kennedy's chorea was "not bothersome" and did not require medical intervention.  (*Id.*)  Kennedy scored a 27/28 on a mobility test and a 20/30 on a functional gait assessment.  (*Id.*)  Dr. Kostyk opined that Kennedy had "significant" cognitive impairment "in a pattern typical for HD with pronounced impairment in domains of executive function."  (*Id.* at 464.)  Dr. Kostyk encouraged mentally stimulating activities and continued social interactions and activities.  (*Id.*)

On January 30, 2024, Kennedy saw Kerri Wilkinson, LSW, and reported she was staying active by doing kickboxing at the gym and yoga at home.  (*Id.* at 458.)

**C.      State Agency Reports**

**1.        Mental Impairments**

On October 12, 2023, David Dietz, M.D., reviewed the file and opined that Kennedy had moderate limitations in all four of the "Paragraph B" criteria.  (*Id.* at 70.)  Dr. Dietz further opined that Kennedy could complete one to four step tasks and complete three to four step tasks in an environment with flexible production standards and schedules.  (*Id.* at 72.)  Kennedy could engage in superficial social interactions

6

and relationships. (*Id.*at 73.) Dr. Dietz opined that Kennedy could function "in an environment where daily work routines are consistent and major changes are explained in advance." (*Id.* at 73.)

On January 15, 2024, on reconsideration, Valerie Budervic, Psy.D., reviewed the file and affirmed Dr. Dietz's findings. (*Id.* at 79, 82-84.)

### 2. Physical Impairments

On August 7, 2023, Gerald Klyop, M.D., reviewed the file and opined that Kennedy had no severe physical impairments. (*Id.* at 69.)

On December 29, 2023, on reconsideration, Shayne Small, M.D., reviewed the file and opined that Kennedy could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (*Id.* at 81-82.) She could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (*Id.* at 81.) She could frequently climb ramps/stairs but never climb ladders, ropes, or scaffolds. (*Id.* at 82.) She could frequently balance, stoop, kneel, crouch, and crawl. (*Id.*) She must avoid all exposure to hazards. (*Id.*)

### D. Hearing Testimony

During the July 22, 2024 hearing, Kennedy testified to the following:

- She lives in a house with her dad. (*Id.* at 41.) Sometimes she needs to use the railing going up and down stairs if she does not take her time. (*Id.*) She does not hold a driver's license. (*Id.*) She completed 10th grade. (*Id.*)

- She last worked about two years ago at Hardee's for about three to four months. (*Id.* at 42-43.) She stopped working there because she was not getting paid enough to make the drive. (*Id.* at 43.) She was working in the back for about four hours a day. (*Id.*) It was hard for her to stand for that long. (*Id.*) She worked three to four days a week. (*Id.*) Before Hardee's, she worked as an office assistant at Jericho House, a drug rehab facility, for about a year. (*Id.* at 43-45.) She was paid as part of a grant. (*Id.* at 44.) She worked about 30 hours a week there. (*Id.*) She also cleaned and prepared food. (*Id.* at 45.) In 2023, she worked as a cleaner for a nursing home for one day. (*Id.* at 42.) She felt overwhelmed and that there was too much going, and it was more fast paced than she could manage. (*Id.*)

- She spends her days watching TV and trying to exercise. (*Id.* at 46.) She had to stop kickboxing because the class was at 8 a.m. and she would have to wake up at 6 a.m.,

7

and she was not getting enough sleep. (*Id.*) Kickboxing was also hard for her to do after a while because of her Huntington's disease; she felt like she could not kick or maintain her balance. (*Id.* at 46-47.) Now she tries to do yoga at home. (*Id.* at 47.) The gym that she went to was very small and it was all people she knew. (*Id.* at 53.) She cleans and sometimes cooks, although her dad is the better cook. (*Id.* at 47.) Sometimes she feels like she is limited in her ability to clean or cook. (*Id.*) She can clean for about 30 minutes before needing a break. (*Id.*) She handles her personal care independently. (*Id.*)

- She experiences anxiety and panic attacks. (*Id.* at 48.) Even bringing a package to the UPS store causes anxiety and panic attacks. (*Id.*) She sees a counselor and takes medication. (*Id.* at 54.) Her medication usually helps. (*Id.*)

- It is hard for her to focus and concentrate on the things she needs to do. (*Id.* at 52.)

- Her Huntington's disease causes clicking in her arms. (*Id.* at 50.) She needs to be careful going up and down the stairs because she has fallen a few times. (*Id.*) She drops things a lot. (*Id.*) She must hold her wrist with the other hand while she is brushing her teeth. (*Id.*) Sometimes she shakes and it makes signing or writing things a little difficult. (*Id.* at 51.) That happens four or five days a week. (*Id.*) Sometimes the twitching or shaking is so bad that it is hard for her to text. (*Id.*) She does not use an assistive device, although sometimes she has balance issues when she walks. (*Id.* at 54.)

- She cannot do a simple job full time because she is slow and gets confused and overwhelmed. (*Id.* at 49.) She often gets frustrated and confused with simple things and that discourages her. (*Id.* at 50.)

The VE testified Kennedy had past work consisting of a composite job of kitchen helper and general clerk. (*Id.* at 57-58.) The ALJ then posed the following hypothetical question:

> Can you please assume a hypothetical individual the same age, education, and work experience as the claimant that can perform at the light exertional work with the following additional limitations.
>
> This individual can occasionally climb ramps and stairs, occasionally balance, as the term balance is defined in the SCO, occasionally stoop, occasionally kneel, occasionally crouch, occasionally crawl. They can never climb ladders, ropes, and scaffolds.
>
> They can frequently handle and finger with the bilateral upper extremities. They can have no exposure to unprotected heights and moving mechanical parts. They can perform no commercial driving. They can understand, remember, and carry out simple instructions. They can make simple work-related decisions.

8

They can have occasional interaction with coworkers and supervisors, but no interaction with the general public. And finally, they can deal with occasional changes in a routine work setting that are explained in advance. Could such a hypothetical individual perform the claimant's past work and because it's a composite it'd have to be as performed?

(*Id.* at 58-59.)

The VE testified the hypothetical individual would not be able to perform Kennedy's past work consisting of a composite job of kitchen helper and general clerk. (*Id.* at 59.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as housekeeping, stock clerk, and office clerk. (*Id.*)

The ALJ modified the hypothetical to limit the individual to sedentary exertion. (*Id.*) The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as office clerk and word processor. (*Id.* at 59-60.)

The ALJ modified the hypotheticals to include a limitation to occasional handling and fingering with the bilateral upper extremities. (*Id.* at 60.) The VE testified the previously identified jobs would be eliminated and there would be "very little to replace them with." (*Id.* at 60-61.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly

9

limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since February 27, 2023, the application date (20 CFR 416.971 *et seq*.).

2.   The claimant has the following severe impairments: Huntington's disease; depression; anxiety; and neurocognitive disorder (20 CFR 416.920(c)).

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except occasional climbing ramps and stairs, balancing (as defined by the SCO), stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; frequent handling and fingering with the bilateral upper extremities; have no exposure to unprotected heights, moving mechanical parts; and perform no commercial driving. The claimant can understand, remember, and carry out simple instructions; make simple workrelated decisions; have occasional interaction with co-workers and supervisors but no interaction with the general public; and deal with occasional changes in a routine work setting explained in advance.

5.   The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on December **, 1990 and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 27, 2023, the date the application was filed (20 CFR 416.920(g)).

(Tr. 20-29.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.

11

*Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    Opinion Evidence

Kennedy argues that the ALJ failed to evaluate the opinion of treating physician Dr. Kostyk in accordance with the regulations.  (Doc. No. 9 at 17.)  Kennedy asserts that while the ALJ found Dr. Kostyk's opinion to be supported by her medical expertise, the ALJ "incorrectly articulates that her opinion is 'not supported' by Plaintiff's activity levels, work, and unidentified objective findings."  (*Id.*) (citation omitted). Kennedy maintains that "[a]s a term of art, this does not articulate an issue with the supportability of Dr. Kostyk's opinions."  (*Id.*)  In addition, Kennedy argues that the ALJ "does not articulate a conclusion regarding consistency but does determine that Dr. Kostyk's opinion was not supported by" other evidence in the record; however, in doing so, the ALJ "ignore[d] favorable evidence even within the consultative evaluation that demonstrated deficits" and the consistency amongst the other examining and treating medical opinions of record.  (*Id.*)  Kennedy asserts that "[b]ecause the ALJ did not properly articulate his evaluation of either supportability or consistency, this Court cannot now assume the ALJ properly took the relevant evidence into account when constructing the RFC."  (*Id.* at 18.)  Therefore, remand is required. (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Dr. Kostyk's opinion.  (Doc. No. 10 at 7.)  The Commissioner argues that the ALJ "noted that most of the statements made by Dr. Kostyk were not 'functional limitations,'" and therefore the ALJ properly rejected the opinion on that ground.  (*Id.* at 8) (collecting cases).  In addition, even if Dr. Kostyk's statements constituted a medical opinion, the ALJ found the opinion inconsistent with other evidence in the record.  (*Id.* at 9.)  The Commissioner asserts that "[w]hile the ALJ did not use the word consistency, he addressed the consistency of Dr. Kostyk's opinion by finding it not supported by the other evidence."  (*Id.*)  In addition, the

13

Commissioner maintains that the ALJ "reasonably considered" Kennedy's activities of daily living in finding Dr. Kostyk's opinion inconsistent with the evidence. (*Id.* at 10.)

Since Kennedy's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). "'[S]upportability' is the extent to which a medical source's *own* objective findings and supporting explanations substantiate or support the findings in the opinion." *Murray v. Bisignano*, Case No. 5:24cv00639, 2025 WL 2249590, at *8 (N.D. Ohio Aug. 7, 2025) (emphasis in original).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2). "'[C]onsistency' is the extent to which a medical source's opinion findings are consistent with the evidence from *other* medical and nonmedical sources in the record." *Murray*, 2025 WL 2249590, at *8 (emphasis in original).

14

requirements. 20 C.F.R. § 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered

the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Dr. Kostyk's opinion as follows:

> The claimant's medical provider issued a letter at the claimant's request (see Exhibit 5F/6) stating that she was not able to work (Exhibit 4F). The provider details the claimant's diagnosis and general symptoms and progression of the disease. She states the claimant is disabled due to the claimant's diagnosis of Huntington's disease. This addresses an issue reserved to the Commissioner and is not entitled to any special significance. To the extent that she does provide functional limitations, they are not persuasive. Although supported by her rationale in the letter, they overall debilitating opinion is not supported by, as noted above, the claimant's ability to go to and utilize a gym with a group of friends; work at near substantial gainful activity at the Jericho House; and the objective findings of record, including her psychological consultative examination, which found that she was calm and stable; displayed no attention problems; did not need directions explained; and had recall of six digits forward, four back, reflective of memory for simple tasks (Ex. 3F).

(Tr. 27.)

Reading the opinion as a whole, the ALJ considered the supportability and consistency of Dr. Kostyk's opinion as required by the regulations.

The ALJ rejected Dr. Kostyk's opinion that Kennedy was disabled as it was an issue reserved to the Commissioner and lacked functional limitations. (*Id.*) "Vagueness, or the failure to propose specific functional limitations, can be a reason to discount a medical opinion. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018)." *Springer v. Comm'r of Soc. Sec.*, Case No. 5:19 CV 2562, 2020 WL 9259707, at *9 (N.D. Ohio Oct. 8, 2020). In her reply brief, Kennedy argues that Dr. Kostyk's opinion included the following functional limitations: (1) avoid climbing; (2) avoid lifting; (3) avoid walking while carrying any objects that might worsen her balance; (4) limited ability to focus and concentrate; and (5) limited ability to tolerate even mildly stressful situations. (Doc. No. 11 at 3-4.) First,

16

Dr. Kostyk's statements that Kennedy had "problems" with focus and concentration and had "trouble tolerating even mildly stressful situations" (Tr. 321), "lack[s] the specificity required for the ALJ to determine 'the most [Plaintiff] can still do despite [Plaintiff's] limitations'.  20 C.F.R. § 416.945(a)(1). Therefore, the ALJ's assessment that the opinion was vague is not erroneous." *Springer*, 2020 WL 9259707, at *9.

However, the ALJ went on to determine that to the extent Dr. Kostyk opined to specific functional limitations, while they were supported by the rationale in Dr. Kostyk's letter, the "overall debilitating opinion" was inconsistent with other evidence in the record.  (Tr. 27.)  The ALJ specifically noted Kennedy's ability to go to a gym with friends; work at "near substantial gainful activity" at Jericho House; and objective medical evidence in the record, including findings in the consultative psychological examination.  (*Id.*)  Elsewhere in the RFC analysis, the ALJ discussed other objective findings inconsistent with Dr. Kostyk's disabling opinion as to Kennedy's ability to lift, carry, and walk, including:

- Involuntary arm movements stopped when taken off neuroleptic medication.

- Mild chorea that was not bothersome and for which there was no need for medication.

- Some trouble with balance but not many falls.

- Staying active doing kick boxing at the gym and yoga at home.

- No drift, no atrophy, and full strength throughout.

- Normal gait.

(*Id.* at 24-25.)  In addition, the ALJ included limitations to no climbing of ladders, ropes, or scaffolds and avoidance of hazards such as unprotected heights and moving mechanical parts in the RFC.  (*Id.* at 23.)

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Kennedy would weigh the evidence differently, it is not for the Court to do so on appeal.  The findings of the

17

Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

To the extent that Kennedy argues that the ALJ erred in failing to use the term "consistency," an ALJ need not specifically use the terms "supportability" or "consistency" in his analysis. *See Cormany v. Kijakazi*, Case No. 5:21CV933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022); *Hardy v. Comm'r of Soc. Sec.,* Case No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021); *Terry Q. v. Comm'r of Soc. Sec.*, Case No. 3:20-cv-0210, 2022 WL 969560, at *5 (S.D. Ohio March 31, 2022); *Fowler v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-01708-BYP, 2022 WL 3648436, at *9 (N.D. Ohio Aug. 9, 2022), *report and recommendation adopted by* 2022 WL 3647771 (N.D. Ohio Aug. 24, 2022). The Court further rejects any argument that the ALJ erred to the extent the ALJ conflated the supportability and consistency factors in the analysis, or to the extent the ALJ's analysis of the supportability and consistency of Dr. Kostyk's opinion overlapped. *Murray v. Bisignano*, Case No. 5:24cv00639, 2025 WL 2249590, at *10 (N.D. Ohio Aug. 7, 2025). A perfect opinion is not required. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

## B.     Subjective Symptom Analysis

Kennedy argues that the ALJ failed to evaluate her subjective symptoms in accordance with the regulations. (Doc. No. 9 at 8-9.) Kennedy asserts that "a lack of objective findings is not a sufficient basis to reject a [p]laintiff's complaints"; "[r]ather, it triggers the ALJ's obligation to consider the factors listed in 20 CFR § 416.1529(c)(2)." (*Id.* at 11.) Kennedy maintains that the ALJ relied solely on her activities of

18

daily living and mischaracterized the evidence regarding her participation in kickboxing and yoga. (*Id.* at 12.) Kennedy argues that the ALJ also erred in relying on her ability to work part-time as a basis to reject her subjective symptoms. (*Id.* at 14.) Kennedy asserts that her testimony "was consistent with her medical records and documentation of the progression of Huntington's disease." (*Id.*) Kennedy maintains that the ALJ "ignore[d] her complaints" about the decline in her executive functioning. (*Id.*) Kennedy argues that "the lack of explanation from the ALJ regarding why Plaintiff's subjective complaints should be rejected leaves the Court with nothing more than a recitation of evidence and mischaracterized reasoning," resulting in harmful error. (*Id.* at 15.)

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Kennedy's subjective symptoms. (Doc. No. 10 at 4.) The Commissioner argues that the ALJ discussed the location, duration, frequency, and intensity of Kennedy's symptoms, as well as precipitating and aggravating factors, the effectiveness of Kennedy's medication, treatments other than medication Kennedy received, and other measures used to relieve her symptoms. (*Id.* at 5.) The ALJ also considered Kennedy's activities of daily living. (*Id.* at 7.) Therefore, the Court should reject Kennedy's argument that the ALJ erred in evaluating her subjective complaints. (*Id.*)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how

19

[those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 416.929(c)(1).  *See also* SSR 16-3p,[5] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[6] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources,

---

[5] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the July 22, 2024 hearing.

[6] In her reply brief, Kennedy faults the Commissioner for failing to respond to her "concern" regarding "the Court's automated deference to ALJ's [sic] based on their ability to observe a claimant when giving testimony" since "the Agency's significant change in procedure has greatly diminished this ability."  (Doc. No. 11 at 3.) However, SSR 16-3p removed the term "credibility" from the analysis.  SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence."  SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).  Therefore, "the Court declines [Kennedy]'s invitation to disrupt longstanding precedent regarding the deference given to ALJ's determinations of credibility on these grounds." *E.W. v. Bisignano*, Case No. 5:25-cv-00017-GFVT, 2026 WL 508792, at *4 n.3 (E.D. Ky. Feb. 24, 2026).

and any other relevant evidence on the record. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[7] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Kennedy's testimony and other statements regarding her symptoms and limitations. (Tr. 23.) The ALJ determined Kennedy's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.* at 24.) However, the ALJ found Anthony's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*)

In the RFC analysis, the ALJ found as follows:

> To the extent the claimant alleges debilitating impairment, the severity of her allegations is not consistent with the overall record. The medical evidence of record does not fully support the claimant's allegations. For instance, a medical consultative examiner noted alertness, good eye contact, normal memory, and good concentration, as well as steady gait, good hand eye coordination, as well as normal strength, and range of motion (Exhibit 2F/4). Similarly, the psychological consultative examiner noted no significant issues aside from poor math ability and poor recall on delay. He indicated that the claimant had no attention problems and was calm, logical, coherent, and stable with a low average range of cognitive abilities (Exhibit 3F). Even the claimant's medical provider indicated that her movements/twitching are mild intermittent (Exhibit 4F). Physical examinations do not yield what appears to be debilitating objective findings (see e.g., Exhibit 5F/6). Despite the claimant's testimony,

---

[7] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

21

treatment records as recent as 2024, note that the claimant was going to the gym three times a week doing kick boxing and strength training while doing yoga at home (Exhibit 7F/5-6). She also reported no falls and to [sic] almost falls where she caught herself (Id.). Additionally, the record shows that the claimant worked at very near substantial gainful activity levels during the period at issue. Per her testimony, she performed several duties at Jericho House that involved being on her feet and lifting and carrying 20 pounds. She testified that she has no problems with personal care. The level of the claimant's activity suggests greater ability than alleged. Nonetheless, the claimant's impairments do warrant some limitations. She is limited to a reduced range of light work with postural and manipulative limitations expressed herein due to the impact of her Huntington's disease and in consideration of her reports of difficulty balancing and shaking, albeit mild as noted in the record. The environmental limitations have also been including as precautionary measures given the nature of the claimant's condition. Moreover, she is limited to simple instructions, simple work-related decisions, and occasional changes in a routine work setting explained in advance given her complaints of memory and focus issues, and overwhelm, as well as estimated low average cognitive ability. Additionally, the interaction limitations have been included based on her reports of difficulty around crowds. The record does not contain evidence of abnormal findings sufficient to document any further limitations during the relevant period.

(Tr. 25.)

The Court finds substantial evidence supports the ALJ's assessment of Kennedy's subjective complaints.  The record evidence, as noted by the ALJ, is not entirely consistent with Kennedy's allegations of disabling conditions.  (*Id.* at 24-25.)  The ALJ credited some of Kennedy's subjective symptoms but did not accept them to the extent alleged by Kennedy because of findings on examinations, her own statements, and activities of daily living, factors to be considered under the regulations.  (*Id.*)  Contrary to Kennedy's argument, the ALJ did not mischaracterize the evidence regarding Kennedy's kickboxing. The ALJ's analysis makes clear that "treatment records as recent as 2024, note that the claimant was going to the gym three times a week doing kick boxing and strength training while doing yoga at home (Exhibit 7F/5-6)." (*Id.* at 25.)  The ALJ accurately summarized this evidence.  (*Id.* at 458-59.)  The fact that Kennedy testified six months later at the hearing that she had stopped kickboxing because the class was early in the morning and she was not getting enough sleep, as well as that it was hard for her to do because of her balance (*Id.* at 46-47), does not mean the ALJ mischaracterized the treatment records.

The Court finds it is able to trace the path of the ALJ's reasoning regarding the subjective symptom evaluation in the decision.  The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton*, 246 F.3d at 772-73.

There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


Date: June 3, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge


**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**